ANNA C. COONEY, guardian, *vs.* WINIFRED MONTANA.

Worcester.  October 11, 1963. — February 11, 1964.

Present: WILKINS, C.J., SPALDING, WHITTEMORE, CUTTER, KIRK, SPIEGEL, & REARDON, JJ.

*Trust,* What constitutes, Oral trust, Trust of personal property, Removal of trustee.

Evidence of certain statements made by a widower to his trusted sister, whom he had designated as beneficiary of a policy of insurance on his life, and to others, required conclusions in the circumstances that the sister was not to take the proceeds of the policy for her own benefit but in trust to apply them, apart from payment of certain expenses, to the benefit of an invalid daughter, another daughter, and a stepdaughter of the insured in accordance with suggestions made by him to the sister, and that the trust applied not only to the face amount of the policy but also to an additional amount paid to the sister by reason of

———

accidental death of the insured, although the suggestions made by him to her as to the application of the proceeds referred only to the face amount. [34–37]

Notice to the cestuis was not necessary to the perfection of an oral trust of the proceeds of a life insurance policy evidenced by statements made by the insured to the beneficiary-trustee and others. [36–37]

In a proceeding in equity in the Probate Court for the removal of the trustee under a trust of the proceeds of a life insurance policy for the benefit of the deceased insured's two daughters and stepdaughter, where it appeared that the trustee, who was the insured's sister, failed when she took the witness stand to produce subpoenaed records of payments made by her from the insurance proceeds, that she was vague as to the disposition of such proceeds, that she had not seen any of the children for three years and had stated that she did not "even want to know them any more," although one of them was an invalid about whom she knew the insured had been worried, that a substantial part of the insurance proceeds was in cash in a safe deposit box to which her attorney had had the only key for a "couple of years," and that she was tardy in a tuition payment for the insured's stepdaughter, the removal of the sister as trustee was required in the circumstances in the interests of the children, even though no dishonesty on her part appeared. [38–39]

PETITION IN EQUITY filed in the Probate Court for the county of Worcester on February 14, 1962.

The case was heard by *Rice,* J.

*Harry Zarrow* (*Marvin K. Rasnick* with him) for the petitioner.

*William P. DeCarolis* for the respondent.

REARDON, J. The petitioner seeks in this proceeding brought in the Probate Court to establish an oral trust of the proceeds of a policy of insurance written on the life of Eugene T. Sullivan, deceased. The probate judge in a report of material facts found that the policy was in the amount of $10,000 and contained a provision affording double indemnity in case of death by accident of the assured. The respondent, Winifred Montana, sister of Eugene T. Sullivan, was named as beneficiary. The judge concluded "that the assured intended that the proceeds of the insurance policy were to be . . . Mrs. Montana's, free of trust, that he intended her to use her sole discretion and judgment in the spending of the proceeds . . . [and] that the only limitation in the proceeds would be a moral and not a legal one." A decree was entered that the entire proceeds of the

policy are the absolute property of the respondent. The guardian of the Sullivan and Vassar children appealed.[1] The evidence is reported.

In addition, the judge made the following findings. In 1948, Sullivan married Cecilia Vassar, a widow with three children. There were two children born of this marriage, Sharleen and Kathleen. Kathleen suffers from a congenital deformity, spina bifida, and has during her short life been subjected to seventeen surgical operations. She is hampered in walking and in other respects. Save for short visits to her family, she has been a resident patient at the Massachusetts Hospital School in Canton since 1954. Cecilia Sullivan died in 1954 and Sullivan continued to maintain in Shrewsbury a normal, happy home for the five children. Sullivan was in business for himself. In late 1958, while on a business trip in a private chartered plane he was killed in a crash in Long Island Sound. The wreckage of the plane was discovered several weeks after the accident by divers and "frog-men." Some time later, the present petitioner, Mrs. Cooney, as maternal grandmother of the Sullivan and Vassar children, and Mrs. Montana, as aunt of Sharleen and Kathleen, filed separate petitions to be appointed the guardian of all five children. The judge found both petitioners suitable persons but appointed Mrs. Cooney because he "felt that the welfare of the Sullivan children would be best served if Sharleen was to live in the same household with the Vassar children and if Kathleen could visit with them from time to time."

Sullivan took out the life insurance policy in 1956 and named Mrs. Montana as his beneficiary. Some weeks later at her home he advised her of this fact. In answer to her question as to what he wanted her to do, he replied that she "was to take care of Sharleen and Kathleen after their high

---

[1] The suit should have been brought in the names of the wards instead of that of the guardian who, however, may represent them. G. L. c. 201, § 37. This purely formal difficulty may be cured by amendment and on that basis we treat the wards as the petitioning parties represented by the petitioner as their guardian. See Greeley v. Flynn, 310 Mass. 23, 28; Ryan v. McManus, 323 Mass. 221, 222-223.

school. That Social Security would take care of them until then. . . . [T]hat she was to use her discretion and judgment in reference to any school they might attend. . . . [T]hat she was to use her discretion and judgment in the spending of this money. . . . [H]e suggested that she spend $5,000.00 for Kathleen, $2,500.00 for Sharleen and after paying the funeral and other expenses that she spend the balance on Callista Vassar (his step-daughter). . . . [T]hat Callista might want to study to be a hairdresser, that . . . Mrs. Montana might pay her tuition. . . . [T]hat she use the same discretion and . . . judgment in supervising them as if they were her own. He stated that she spend $10,000.00. . . . He was particularly worried about his daughter Kathleen . . . . Her future was necessarily vague."

The insurance company paid Mrs. Montana $18,972.77. She spent $300 for divers and "frog-men," over $300 for furniture and clothing for the Sullivan children, $3,000–$4,000 for her father's welfare, $500 for travel expenses of her brother George and herself in "travelling to and from the Connecticut area" where Sullivan's body was found, and $422.75 toward tuition in a hairdressing school for Callista. She has expended, in one way or another, all money received by her in excess of $10,000, which latter sum in cash she has placed in a safe deposit box.

The judge also found that Sullivan trusted his sister who was "[t]he closest person to him," and that he was an intelligent businessman who could have, had he wished, set up a trust in the policy itself. He died intestate leaving a gross estate valued at approximately $19,000 largely derived from a compromise of an action based upon his death.

Since the evidence is reported, it is our duty to decide the case in accordance with our "own judgment, giving due weight to the findings of the judge, which will not be reversed on oral testimony unless plainly wrong." *MacLennan* v. *MacLennan,* 316 Mass. 593, 595. *Malone* v. *Walsh,* 315 Mass. 484. The determinative testimony is that of Mrs. Montana concerning the conversation with her brother

which is not disputed. The present issue is not whether that testimony should be believed but how it should be interpreted. As in the *MacLennan* case we may draw inferences of fact and "no weight is to be attached to inferences drawn by the trial judge." In the light of these principles we consider whether in the circumstances a trust has been created. *Russell* v. *Meyers,* 316 Mass. 669, 672–673.

A review of the evidence illuminates certain aspects of the case not treated in the judge's report. Mrs. Montana, served with a subpoena duces tecum two days before the hearing, failed to bring with her records of payments made by her from the proceeds of the insurance policy. She testified that following receipt of the check from the insurance company she deposited it in a savings account in a Cambridge bank and that after the guardianship hearing in November, 1959, she placed $10,000 in cash in a safe deposit box. Her testimony concerning her disposition of that money which she received in excess of $10,000 was not specific. She stated that in her conversation with her brother nothing was said about the double indemnity provision in the policy. She told of giving the welfare officer of the town of Shrewsbury a "little over $200" for beds and furniture for the children. She estimated that she spent $3,000–$4,000 for her father, and she explained that she "didn't keep track" of the money "over the $10,000." She stated that her brother had said nothing to her about the expenditure of any money for the father. She said she had not seen any of the three girls since the hearing on the guardianship three years before, although she had occasionally visited Kathleen prior to that hearing. She could not state the ages of any of the three girls. She further said that her attorney had the only key to the safe deposit box in a Boston bank containing the $10,000 in cash. Her brother asked her to "see to it that Kathy would be taken care of." Her father had died the year before this hearing in a nursing home where he had been for three years at State expense, and the amounts she spent on him were for extras.

In response to the question, "Do you remember telling

the Judge . . . [at the guardianship hearing] that your
brother Eugene had told you and that you knew that this
money was to be used for the children?'' the respondent
answered, ''Yes,'' the only reservation in the respondent's
answer relating to the time of its use.  To the question,
''And you agreed to do what he asked you to do?'' the reply
came, ''That's right.''  The respondent also testified to
being in reasonably comfortable economic circumstances
personally.

Callista Vassar testified that her stepfather had told her
about the policy which with Mrs. Montana as the beneficiary
''was to take care of the children, if anything should hap-
pen to him.''  She said that she had gone to a hairdressing
school after her stepfather's death and was forced at one
point to leave following a futile request to Mrs. Montana
that her tuition be paid; that, two or three months later,
Mrs. Montana did pay the tuition and she returned to the
school.  She stated that in a telephone conversation with
Mrs. Montana relative to possible repair of a radio given to
Kathleen by Mrs. Montana, the respondent said ''she didn't
know nothing about the radio and she said she didn't want
to hear any more about the children.  The two girls, she
didn't want nothin' more to do with them.''  To a question
from Callista, '' [Y]ou don't even want to know them any
more?'' she replied, ''That's right.''

An aunt of the children, Geraldine Joubert, testified that
her brother-in-law had told her that ''he had taken out quite
a large policy . . . [that] he had an understanding with
. . . [Mrs. Montana] and, if anything happened to him, she
would take care of the kids with the money.''

The petitioner testified that she had been taking care of
the children '' [p]ractically since they were born''; and that
Kathleen came home to her on holidays and vacations.

We must decide whether the conversation between Sulli-
van and his sister imposed an oral trust on the insurance
proceeds.  ''An express trust in personal property may be
created and proved by parol.''  *Rugo* v. *Rugo,* 325 Mass.
612, 617.  *Russell* v. *Meyers,* 316 Mass. 669, 672.  No par-

ticular form of words is necessary but the words employed must unequivocally show an intention that the legal estate be vested in one person to be held in some manner or for some purpose on behalf of another. *Atkins* v. *Atkins,* 279 Mass. 1, 8. See Scott, Trusts (2d ed.) § 52; Bogert, Trusts and Trustees, § 65. The existence of a trust does not depend upon the terminology used and failure to employ the word "trust" is in no sense determinative of whether one has been created. *Rugo* v. *Rugo,* 325 Mass. 612, 616. See *Gordon* v. *Gordon,* 332 Mass. 193, 195. The setting and circumstances surrounding the conversation serve to light up the intention of the deceased which controls whether precatory words established an enforceable trust rather than a mere moral obligation. See *Temple* v. *Russell,* 251 Mass. 231, 235–236. See also *Wheeler* v. *Kennard,* 344 Mass. 466, 469; Restatement 2d: Trusts, § 25; Scott, Trusts (2d ed.) §§ 25–25.2; Bogert, Trusts and Trustees, § 48. Occasionally, words of an ordinarily precatory nature may take on a mandatory character from their setting so as to impose "an imperative duty upon those to whom they are addressed." *Lowell* v. *Boston,* 322 Mass. 709, 739. Enforceable trusts have been founded upon precatory words. *Temple* v. *Russell, supra.* *Warner* v. *Bates,* 98 Mass. 274. See *Bramley* v. *White,* 281 Mass. 343. Cf. *Poor* v. *Bradbury,* 196 Mass. 207. Additional tests by which to determine the presence or absence of a trust are suggested in Bogert, Trusts and Trustees, § 48, pp. 345–349, as (1) definiteness and certainty with which the res and the cestuis of the supposed trust are described; (2) whether the discretion given to the supposed trustee is so broad as to allow him to bestow no benefits upon the cestuis; and (3) whether the cestuis have a natural claim on the supposed creator of the trust.

Full consideration of the uncontradicted circumstances obtaining here leads us to the conclusion that an express trust was established by the conversation of Eugene Sullivan and the respondent for the benefit of Sharleen and Kathleen Sullivan and Callista Vassar. It is clear that Sullivan's primary purpose in taking out the policy was to

provide for them.   Nowhere is it evident in what is before us that the respondent was to share in any part of the proceeds which he placed in her hands with definite purposes in mind.   The evidence compels this view.   While the language he employed in discussion with his sister concerning arrangements for the three children could not be described as mandatory, she was his sister and extremely close to him. In the circumstances, it was not to be expected that he would reduce his wishes to words of command.   See *Warner* v. *Bates,* 98 Mass. 274, 280.   Nevertheless, that he so considered them is evidenced by his disclosure to Mrs. Joubert and to Callista of the arrangement which he had made with the respondent.   He sought to provide for the natural objects of his bounty and their stepsister, Callista, and he was concerned particularly with the future of his invalid daughter, Kathleen.   From Sullivan's failure to discuss the double indemnity feature of the policy with the respondent no intention on his part can be inferred that any part of such proceeds should become the property of the respondent.

The respondent argues that notice to the cestuis was a necessity if an oral trust were to be perfected.   We cannot agree that these circumstances so require.   "Cases in which a requirement of notice to the beneficiary has crystallized into a rule of law . . . [are those] in which it is claimed that an owner of personal property such as savings bank books or securities, while retaining physical control, has voluntarily, without previous legal obligation, and in some more or less informal manner, declared himself trustee for the benefit of the claimant, and where the court looks for notice to the beneficiary as necessary proof of the finality of the alleged settlor's action."   *Aronian* v. *Asadoorian,* 315 Mass. 274, 277, and cases cited.   This rule, however, is not applicable where the holder of the legal title, instead of attempting to declare himself a trustee, completes a transfer of title to another person as trustee.   *Ibid.* at 277.   And "[n]otice to the donee is indeed not necessary when other acts or declarations of the donor are sufficient and complete

in themselves . . . ." *Gerrish* v. *New Bedford Inst. for Sav.* 128 Mass. 159, 163. Cf. *Corkum* v. *Salvation Army of Mass. Inc.* 340 Mass. 165; *Mikshis* v. *Palionis,* 345 Mass. 316.

This is not the case of a donor designating himself as trustee of a savings account for the benefit of one who remains in ignorance of the donor's act. And here there was not only the vital and undisputed conversation between donor and trustee. There was his further verbal indication to the petitioner, to an aunt of all the children and also to his stepdaughter that he had made certain insurance provisions for the benefit of those whom he intended to aid.

We pass to a consideration of the failure of Sullivan to explore in his conversation with the respondent the double indemnity payment which the policy on his life provided should he perish through accident. Various alternatives relative to the proceeds over $10,000 present themselves. Again we refer to the crucial conversation. The talk was based on the sum of $10,000 and that alone. Sullivan gave no instructions as to any excess, and no discussion relative to it occurred. In breaking down the sum of $10,000 in benefits for his two daughters, Callista, and his funeral expenses, his intent as evidenced by his instructions to the respondent related solely to $10,000. Yet it is clear that he intended that the entire proceeds of his policy be held in trust. Fairly interpreting his words, he was telling his sister what he desired done with the entire proceeds which he was assuming would total $10,000 of which she was to take nothing for her own use. No indication anywhere appears that he intended her to enjoy any excess. We are thus confirmed in our opinion that the entire proceeds of the policy were to be held by her under an express trust. See *Chase* v. *Union Natl. Bank,* 275 Mass. 503, 505–506.

Of the total proceeds so held, one half shall be applied for the use of Kathleen and one quarter for the use of Sharleen, subject to adjustments of their respective shares for certain sums spent by Mrs. Montana for Kathleen and Sharleen. Funeral and other proper expenses are then to be deducted from the balance. The remainder, less the amount

already spent for her tuition, shall be applied to the use of Callista.

Finally, we consider those prayers of the petition which seek the removal of the respondent as trustee and the appointment in her place of the petitioner or some other suitable person. Power is lodged in the court under its general equity jurisdiction to engage in such a removal in appropriate circumstances. See *Shirk* v. *Walker,* 298 Mass. 251, 253. See also *Massa* v. *Stone,* 346 Mass. 67, 74–75.

We have concluded that the proceeds of the policy were held by the respondent under trust. "The burden of proving the existence of the trust was upon the plaintiff, but, that being established, the defendant had the burden of showing that he had discharged the duties of trustee with reasonable skill, prudence, and judgment." *Rugo* v. *Rugo,* 325 Mass. 612, 617. "This included the duty to keep clear and accurate accounts. . . ." *Ibid.* at 617. The various grounds on which a trustee may be removed have been quite thoroughly treated in a substantial number of decisions over the years. "It is not necessary, in order to support the application [for removal], for the plaintiff to show that the trustee has acted from dishonest or selfish motives." *Scott* v. *Rand,* 118 Mass. 215, 218. A petition for removal calls for careful consideration "of all the circumstances, the existing relations, and to some extent the state of feeling between the parties. It is addressed to the reasonable discretion of the court." *Ibid.* at 217. Where there are evidences of hostility between trustee and beneficiary which have arisen since the creation of the trust and "where the existence of the hostility would naturally pervert his feelings and judgment, it is competent for a justice to remove a trustee without further proof of misconduct, upon the ground that the removal appears essential to the interests of the beneficiary." *Wilson* v. *Wilson,* 145 Mass. 490, 493. See *Gordon* v. *Gordon,* 332 Mass. 210, 212. See also *Comstock* v. *Bowles,* 295 Mass. 250, 260; *Sparhawk* v. *Sparhawk,* 114 Mass. 356. The standard to which the trustee in Massachusetts is held in the management of the funds entrusted

to his care is too well known to do other than to make simple reference to it. That standard requires consideration by the trustee not only of what is held as capital but also what can be produced as income. We thus apply the foregoing tests to the facts at hand.

Here the trustee appeared on the stand and, although summoned with her records, came without them and gave little evidence that she had a complete awareness of the details of disposition of the funds which came to her through the policy. The record is as meager as to that disposition as the respondent was vague. There is no intimation in the record, nor do we intend one, that the respondent was dishonest. But we are impressed that she had not for three years seen any of the three children for whom she was in fact a trustee and further that she indicated to Callista that she did not "even want to know them any more." Sullivan had expressly worried about Kathleen, his invalid daughter. She did not visit this girl in the three years prior to the hearing. The $10,000 remaining from the insurance policy is in cash in a safe deposit box with the only key in the hands of an attorney who has had it a "couple of years." There is no income from this cash. Callista was forced, through lack of funds, to leave the hairdressing school at one point for two or three months until the respondent made the payment on her tuition which permitted her return. Thus, we conclude that the interests of the three children whom Sullivan had in mind when he talked with his sister about his policy require the removal of the respondent as trustee. We are of the opinion, however, that the probate judge, in a more advantageous position than we to see and assess the petitioner and the situation, is better able to make the determination of a successor trustee, and that phase of this case is thus left to him.

All other questions of accounting among the respondent, the trust, and the estate, in view of the paucity of exact information in the record, are to be adjusted under the direction of the probate judge. Undoubtedly, many of the payments made by the respondent constitute properly paid

charges against the estate. Compensation of the respondent for her services as trustee is left to the exercise of the sound discretion of the probate judge who is to determine what, if any, compensation for those services will be paid to her. See *Sullivan* v. *Sullivan,* 335 Mass. 268, 279–280; *Wasserman* v. *Locatelli,* 343 Mass. 82, 87.

The final decree is reversed and a new decree is to be entered conformable to the foregoing. Costs of appeal are to be in the discretion of the Probate Court.

*So ordered.*