**In re Arthur GOLDSTEIN, Debtor.**

**Kevin J. Shea, Plaintiff,**

**v.**

**Arthur Goldstein, Defendant.**

**Kevin J. Shea, Plaintiff,**

**v.**

**Arthur Goldstein and Matthew D. Rockman, Chapter 7 Trustee, Defendants.**

**Bankruptcy No. 98–47316 JFQ. Adversary Nos. 98–4326, 99–4013.**

United States Bankruptcy Court, D. Massachusetts.

May 26, 1999.

## DECISION

JAMES F. QUEENAN, Jr. Bankruptcy Judge.

These adversary proceedings stem from a fee-sharing agreement between two lawyers, Kevin J. Shea, Esq. ("Shea") and Arthur Goldstein, Esq. (the "Debtor"). At the heart of both cases is this question: When the Debtor agreed to pay Shea one-third of each fee payment he received under a structured settlement, did the Debtor thereby create a trust for the benefit of Shea? Also at issue is the effect which delivery of a promissory note for some of the debt has upon the nature of the debt and hence its dischargeability.

In Adversary Proceeding ("A.P.") No. 98–4326, brought by Shea against the Debtor, Shea requests a determination that fees accrued and unpaid to him pre-petition represent a "debt ... for fraud or defalcation while acting in a fiduciary capacity, embezzlement, or larceny" within the meaning of section 523(a)(4) of the Bankruptcy Code. In A.P. No. 99–4013, brought by Shea against the Debtor and

Matthew D. Rockman, the Chapter 7 trustee, Shea seeks a declaration that the fee-sharing agreement created a trust for Shea's benefit, with the result that Shea's one-third portion of fee payments due the Debtor after the bankruptcy filing are Shea's property and not property of the bankruptcy estate. The two proceedings have been consolidated for trial.

Now before the court is a motion, filed by the Debtor in each adversary proceeding, which is entitled "Motion ... A. To Dismiss; B. For Judgment on the Pleadings and/or C. For Summary Judgment."

## I. FACTS

The parties have filed affidavits and memoranda in support of and in opposition to the motions. The affidavits and the contractual documents attached to them, together with the pleadings, a pretrial stipulation and the Debtor's bankruptcy schedules, show substantial agreement on the factual background. Because the Debtor is the moving party, in reciting the facts I make all reasonable inferences in Shea's favor. *See Cadle Co. v. Hayes,* 116 F.3d 957, 959 (1st Cir.1997).

Shea was admitted to the Massachusetts bar in December of 1977. In 1979 he became associated with the Debtor, who had been practicing law in Worcester for 25 years. Shea devoted much of his time to the Debtor's "collection" practice, whose fees he and the Debtor split on a fifty-fifty basis. He also assisted the Debtor in other matters and split the fees with the Debtor on these matters at varying percentages. Shea retained all fees from services he rendered to his own clients. At no time did the Debtor pay him a salary or withhold payroll taxes on funds Shea received from the Debtor's practice.

Upon the death of the Debtor's brother, Alan D. Goldstein, the Debtor was appointed executor of his brother's estate. In 1980 the Debtor as executor commenced a medical malpractice suit against the doctor who had treated his brother, joining also the doctor's professional corporation. The Worcester Superior Court dismissed the case on the ground that, following the filing of an adverse report by a medical tribunal, the estate had filed the requisite bond three days late. The Debtor appealed on behalf of the estate and enlisted Shea's help. They orally agreed that Shea's compensation would be one-third of any fee generated from the case, which had been undertaken on the basis of a one-third contingent fee. They thereafter appeared in the case as co-counsel. The Massachusetts Appeals Court rendered a decision favorable to the estate, and insurance company defense counsel requested further appellate review by the Supreme Judicial Court of Massachusetts. That Court's decision was also favorable to the estate.

Shortly thereafter, on June 3, 1982, the estate entered into a structured settlement agreement with Aetna Casualty and Surety Company ("Aetna"), the defendants' insurer. Under the agreement Aetna promised to make the following payments: (a) $50,000 to the Debtor as executor, payable forthwith; (b) $5,000 per year to the Debtor as executor for four years, with payments to commence on August 1, 1982; (c) $500 per month to Roberta Goldstein, the decedent's widow, for the rest of her life but guaranteed for 240 months, payments to commence June 1, 1982; (d) $50,000 to Roberta Goldstein, payable on June 1, 1992; (e) $150,000 to Roberta Goldstein, payable on June 1, 2002; (f) $5,000 per year, for four years, to Jodi L. Goldstein, the decedent's daughter, payments to commence on August 2, 1984; and (g) $6,000 per year, for four years, to Steven E. Goldstein, the decedent's son, payments to commence on July 3, 1987.

Aetna agreed to make these payments in the following manner: (1) sums payable as set forth in (a) and (b) above were to be paid to the Debtor as executor; (2) sums payable as set forth in (c), (d) and (e) above were to be paid one-third to the Debtor for the attorney's fee and two-

thirds to Roberta Goldstein; (3) sums payable as set forth in (f) above were to be paid one-third to the Debtor for the attorney's fee and two-thirds to Jodi L. Goldstein; and (4) sums payable as set forth in (g) above were to be paid one-third to the Debtor for the attorney's fee and two-thirds to Steven E. Goldstein.

Thereafter, when the Debtor received a fee payment from Aetna, he would deposit the check, allow it to clear, and then issue a check to Shea for Shea's one-third share. In almost every instance the Debtor deposited Aetna's check in his "trustee for clients' account" and paid Shea from that account.

In early 1983 Shea received an offer to join a Worcester law firm. He and the Debtor agreed to an amicable parting and decided to reduce their fee-sharing agreement to writing. On March 18, 1983, the day they terminated their association, they entered into the written agreement which is the subject of these proceedings. They first acknowledged the payments that had already been made to Shea, namely one-third of the one-third legal fee payable with respect to the $50,000 lump sum payment, the first of the $5,000 annual payments, and the first nine monthly payments of $500 each.

The agreement of March 18, 1983 went on to provide for the sharing of fees which remained to be paid by Aetna under the structured settlement. It did so in these words:

4. That, with respect to item c on page #3 of the settlement agreement hereto annexed and marked "A", and subject to the terms of item 2 on page #3.1 of said agreement, so long as the monthly payments of $500.00 provided for in said item c on page #3 shall continue, Kevin J. Shea, Esquire shall receive the amount of $55.55 from that one-third portion of said payments to be paid to Arthur Goldstein, Esquire in accordance with item 2 on page #3.1 of said agreement;

5. That, with respect to item d on page #3 of the settlement agreement hereto annexed and marked "A", calling for a $50,000.00 payment on June 1, 1992, Kevin J. Shea, Esquire shall receive from the one-third of said payment to be paid to Arthur Goldstein, Esquire in accordance with item 2 on page #3.1 of said agreement, the sum of $5,555.55 upon receipt of said one-third by Arthur Goldstein, Esquire;

6. That, with respect to item e on page #3 of the settlement agreement hereto annexed and marked "A", calling for a $150,000.00 payment on June 1, 2002, Kevin J. Shea, Esquire shall receive from the one-third of siad [sic] payment to be paid to Arthur Goldstein, Esquire in accordance with item 2 on page #3.1 of said agreement, the sum of $16,666.66 upon receipt of said one-third by Arthur Goldstein, Esquire;

7. That, with respect to item b on page #3 of the settlement agreement hereto annexed and marked "A", calling for four (4) $5,000.00 payments to be made on August 1, 1982, on August 1, 1983, on August 1, 1984 and on August 1, 1985, payable in full on said dates to Arthur Goldstein, Esquire in accordance with item 1 on page #3.1 of said agreement, Kevin J. Shea, Esquire shall receive from Arthur Goldstein, Esquire, upon his receipt of said payments, the sum of $555.55 from each of said payments remaining to be paid as of the date of execution of this Agreement; by this clause is meant that Kevin J. Shea, Esquire shall receive the sum of $555.55 on or about August 1, 1983, August 1, 1984 and August 1, 1985.

Aetna continued (and still continues) to make payments under the structured settlement agreement. Until August of 1991, the Debtor continued to pay Shea his one-

third share of the one-third legal fee, although, as Shea puts it, "not always as promptly as I may have, from time to time, requested." In August of 1991 the Debtor was suspended from the practice of law. He was reinstated in April of 1997. The Debtor made no payment to Shea during this period, although Aetna continued to pay him. Shea's relationship with the Debtor nevertheless remained amicable. Shea testified on the Debtor's behalf in proceedings before the Massachusetts Board of Bar Overseers in which the Debtor sought to have his license to practice law reinstated. Nor did Shea demand payment under the fee-sharing agreement during this period. In Shea's words, "given [the Debtor's] suspension from practice, I chose not to make demands upon [the Debtor] during that time for the funds he had failed to turn over to me." The parties had no discussion concerning fee-sharing payments during this period.

In January of 1997 Shea learned from the Debtor's son that the Board of Bar Overseers had granted the Debtor's application for readmission to the Massachusetts bar. A few weeks later he wrote the Debtor expressing his desire to be paid what had accrued to him and his concern that the statute of limitations might become a problem in collecting this debt. The Debtor was readmitted to the Massachusetts bar in April of 1997. He did not immediately resume payments to Shea, but in the ensuing months the parties had several discussions about the debt that had accrued.

On August 22, 1997, Shea and the Debtor entered into another written agreement. Under it, the Debtor agreed to resume making the payments called for by the parties' 1983 agreement. The Debtor at the same time signed a promissory note payable to Shea in the principal amount of $9,555.15, which was the amount of the debt accrued to then. The agreement states that the Debtor was obligating himself under the note "in consideration of [Shea's] promise and agreement to forebear from bringing suit or otherwise proceeding against [the Debtor] for his breach of, and failure to comply with, the terms of the 1983 Agreement ...." The note provides that it is payable in full, without interest, in one year, or, at the Debtor's option, over 24 months commencing one year hence with interest at the rate of 7% per annum. The note contains a clause accelerating the due date upon the Debtor's failure to make any principal payment.

Commencing in August of 1997 and continuing through May of 1998, the Debtor observed the terms of the parties' 1982 agreement by making the payments due Shea from sums the Debtor received from Aetna during this period. In doing so he paid Shea a total of $555.50. As was his right, the Debtor made no payments on the promissory note during the first twelve months. As was not his right, he failed to make the payments due on August 22, 1998 and September 22, 1998.

On October 2, 1998, the Debtor filed with this court a petition under chapter 7 of the Bankruptcy Code. In his schedules he reported the fees receivable under the structured settlement with Aetna at a value of $20,775.32, which he explained was their present value "net of ⅓ contractual obligation payments that are due post petition." These contractual obligations, he further explained, are to "co-counsel who was involved in the case work in 1978–82." The Debtor claimed an exemption on the Aetna receivable in the sum of $3,119.42 pursuant to section 522(d)(5) of the Bankruptcy Code. I do not pass on the propriety of any of these items. Inconsistently, in light of the two-thirds net listing of the Aetna receivable, the Debtor reported Shea as a creditor (for $10,387.65) with respect to sums due from Aetna on and after October of 1998. Although he lists a debt of $10,055.02 due Shea through September of 1998, the parties' pretrial stipulation states the prepetition debt is $9,888.83. The total unsecured debt of $197,875.48 which the Debtor scheduled is comprised mostly of credit card debt.

## II. EXISTENCE OF A TRUST

If the Debtor is treated as holding one-third of the Aetna receivable in trust for Shea, there are two consequences. Shea's portion of the postpetition receivable, being equitably owned by Shea, is not part of the bankruptcy estate. *See* 11 U.S.C.S. § 541(d) (Law.Co-op.1997). And the Debtor's failure to make the payments due prepetition would constitute "defalcation while acting in a fiduciary capacity," making the prepetition debt nondischargeable under section 523(a)(4). *See* 11 U.S.C.S. § 523(a)(4) (Law.Co-op.1997); *In re Marchiando,* 13 F.3d 1111 (7th Cir.), *cert. denied,* 512 U.S. 1205, 114 S.Ct. 2675, 129 L.Ed.2d 810 (1994) (debt under section 523(a)(4) confined to fiduciary relationships, such as that created by express trust, which are in existence before wrong committed).

█ A trust has been defined as a "fiduciary relationship with respect to property, subjecting the person by whom the title to the property is held to equitable duties to deal with the property for the benefit of another person, which arises as a result of a manifestation of an intention to create it." *Restatement (Second) of Trusts* § 2 (1959). Whether an agreement creates a trust or merely debt depends upon whether there is manifestation of intent to create a trust. *Restatement (Second) of Trusts* § 12 cmt. g; 1 Austin W. Scott & William F. Fratcher, *The Law of Trusts* § 12 (4th ed.1987). There can be no trust without such manifestation. *See Ventura v. Ventura,* 407 Mass. 724, 555 N.E.2d 872, 874 (1990); *Cooney v. Montana,* 347 Mass. 29, 196 N.E.2d 202, 206 (1964); *Russell v. Meyers,* 316 Mass. 669, 56 N.E.2d 604, 606 (1944). No particular words need be used. *See Cooney,* 196 N.E.2d at 206; *Restatement (Second) of Trusts* § 23 cmt. a; Scott, *supra,* § 23. "A trust may be created although the settlor does not use the word 'trust,' and the fact that the settlor uses the word 'trust' does not necessarily indicate that a trust is intended." *Restatement (Second) of Trusts* § 24 cmt. b; *see also* Scott, *supra,* § 24. For example, a trust is created, in the absence of a contrary intention, by a conveyance accompanied by the direction of the grantor that the grantee sell the property and pay the proceeds to another. *See id.*

█ It is not enough, however, that the putative settlor manifest an intention to create a trust at some future time; if a trust is to exist immediately he must have that intention at the time of the manifestation. *See Restatement (Second) of Trusts* at § 26; Scott, *supra,* § 26. A promise to create a trust in the future must nevertheless be distinguished from the creation of a present trust whose corpus consists of a promise to be performed in the future. "A promisee of an enforceable promise to be performed in the future can hold his rights as promisee in trust for a third person." *Id.* at § 26 cmt. n. This applies to a promise to pay money. But for a trust to exist right away there must be a manifestation of an intention to create an immediate trust of the promisee's rights and not just a trust of the money when paid. *See id.; see also New England Trust Co. v. Sanger,* 337 Mass. 342, 149 N.E.2d 598, 602 (1958) ("[T]here can be no trust unless there is an existing trust res.")

█ In applying these principles to the facts here, our summary judgment context is significant. "Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). If that showing is not made, there is no genuine issue of material fact. *See id.* As the plaintiff, Shea has the burden of proof on the question of the existence of a trust. Could a fact finder reasonably find from the evi-

dence proffered here that a trust for the benefit of Shea exists?

■ The parties' 1983 agreement does not use the term "trust." As discussed, that does not, of itself, establish that no trust exists. But it certainly points in that direction, particularly here where both parties are lawyers familiar with the term.

Other evidence favors the existence of a trust. The parties' 1983 agreement goes beyond stating, as it does, that Shea is to receive his one-third share "upon receipt" by the Debtor of a payment from Aetna. When referring to Shea's share of the various Aetna payments, the agreement provides in each instance that Shea shall be paid "from" the Aetna payment. This can be interpreted as an indication Shea has a property interest in either the payment or the receivable. If the latter inference is made, Shea would have a property interest in both the receivable and the payment because it is proceeds of the receivable. The agreement here is somewhat similar to the Restatement's illustration of the creation of a trust by a grantor of property directing the grantee to sell the property and pay the proceeds to another. *See Restatement (Second) of Trusts* § 24 cmt. b, illus. 2.

Two actions of the Debtor can be interpreted as admissions of a manifestation of intent to create a trust. In making payments to Shea, the Debtor did so in almost every instance by drawing checks on his "trustee for clients' account." From this one could infer the Aetna checks had been deposited into that account and hence that the Debtor recognized he held Shea's one-third share in trust. The Debtor's bankruptcy schedules can also be construed as indicative of a trust. He did not schedule the gross Aetna receivable as his property. He instead scheduled only a net two-thirds share after deducting Shea's one-third,

from which one could infer he believed Shea held a property interest in the remaining one-third.

These inferences of manifestation of intention to create a trust are permissible, not mandatory. But the same can be said of the opposite inference that can be made from the absence of trust terminology in the 1983 written agreement. I conclude sufficient evidence has been proffered to support a finding of a trust.

One could infer that a trust was intended only in the Aetna payment, not in the receivable. If this inference is taken, no trust exists until a payment is actually made. This interpretation would have no effect upon the nature of the indebtedness which accrued prior to the filing. But because there must be an existing corpus to have a present trust, it would mean the Aetna receivable at the petition filing date is part of the bankruptcy estate. Shea would then be remitted to the equitable remedy of having a trust declared in each payment once it is received. That would do him little good in bankruptcy. Such an equitable remedy falls within the statutory definition of "claim."[1] *See CRS Steam, Inc. v. Engineering Resources, Inc. (In re CRS Steam, Inc.)*, 225 B.R. 833 (Bankr. D.Mass.1998) (constructive trust rights constitute claim); *Maids Int'l, Inc. v. Ward (In re Ward)*, 194 B.R. 703 (Bankr. D.Mass.1996) (rights under covenant not to compete constitute claim). Section 523(a)(4) would then make the claim nondischargeable.

■ In his affidavit the Debtor states "[t]here never was any intent to set up a declaration of trust. . . ." The Debtor's subjective intent, however, is not dispositive. The question is whether there has been a *manifestation* of intent to create a trust. A party's state of mind can at times

---

1. Section 101(5)(B) of the Code defines "claim" to include:

> (B) right to an equitable remedy for breach of performance if such breach gives rise to a right to payment, whether or not such right to an equitable remedy is reduced to judgment, fixed, contingent, matured, unmatured, disputed, undisputed, secured, or unsecured.

11 U.S.C.S. § 101(5) (Law.Co-op.1997).

be resolved in summary judgment. *See Desmond v. Varrasso (In re Varrasso)*, 37 F.3d 760, 764 (1st Cir.1994) (state of mind susceptible to summary judgment disposition not appropriate where movant has burden of establishing nonmovant's state of mind). But there is no occasion to do that here because the crucial question involves manifestation of intent.

In sum, these circumstances justify, but do not require, a finding that the Debtor manifested an intention to create, for the benefit of Shea, a present trust in the Aetna receivable. *See, e.g., Cabaniss v. Cabaniss*, 464 A.2d 87 (D.C.1983) (affirming finding of manifestation of intent to create trust); *Klein v. Bryer*, 227 Md. 473, 177 A.2d 412 (1962) (finding declaration of trust by broker for benefit of salesman in one-half of commissions due); *DeRosa v. Jacone (In re Jacone)*, 156 B.R. 740 (Bankr.S.D.N.Y.1993) (allegations of trust in escrow fund sufficient to withstand motion to dismiss); *Alithochrome Corp. v. East Coast Finishing Sales Corp. (In re Alithochrome Corp.)*, 53 B.R. 906 (Bankr. S.D.N.Y.1985) (issue of fact as to whether contract created trust or security interest). One could also find that the Debtor's intent was to create a trust only in each payment as it is received. There are therefore two genuine issues of material fact: (i) whether the Debtor manifested an intention to create a trust, and (ii) if he did, whether that intention was to create a present trust in his right to receive fee payments from Aetna or a future trust in each payment when received. Thus summary judgment must be denied. *See* Fed. R.Bankr.P. 7056.

The Debtor contends there is no fiduciary relationship here because the parties are lawyers who dealt with each other on an equal footing. It is true, but irrelevant, that lawyers do not bear a fiduciary relationship with each other. Nor does a banker have a fiduciary relationship with his customer. But that changes if the banker acts as trustee for the benefit of his customer. So too here. The decisions relied upon by the Debtor are distinguishable in that they deal only with the general question of whether a fee-sharing agreement between lawyers creates a fiduciary relationship, not whether a trust existed. Indeed, the facts of these cases do not appear to support a trust. Nor was its existence argued. *See In re Woldman*, 92 F.3d 546 (7th Cir.1996); *Weisberger v. Guth (In re Guth)*, 210 B.R. 294 (Bankr. N.D.Ohio 1997); *Gore v. Kressner (In re Kressner)*, 206 B.R. 303 (Bankr.S.D.N.Y. 1997), *aff'd*, 152 F.3d 919 (2d Cir.1998).

## III. EFFECT OF NOTE UPON FIDUCIARY NATURE OF PREPETITION DEBT

The Debtor has a final gasp. Conceding for the moment that there has been defalcation by a trustee, he contends Shea's acceptance of the 1997 note created new indebtedness which is purely contractual and devoid of fiduciary defalcation. He argues, in other words, that the note constitutes a substituted contract, not an accord.

 An accord is a contract under which an obligee promises to accept certain performance in satisfaction of the obligor's existing duty. *See Restatement (Second) of Contracts* § 281 (1981). Until performance is rendered under the accord, the obligor's original duty is suspended, unless there is a breach of the accord by the obligor which discharges the obligee's duty to accept performance under the accord. *See id.* If there is such a breach, the obligee may enforce either the accord or the original obligation. *See id.*

 A substituted contract is different. It is a contract which *in itself* is accepted by the obligee in satisfaction of the pre-existing obligation. *See id.* at § 279. The effect is to discharge the original duty, whether it be contractual or otherwise, and to replace it with a new duty under the substituted contract. *See id.;* E. Allen Farnsworth, *Farnsworth on Contracts* § 4.24 (2d ed.1998).

■ Whether the parties' agreement is an accord or a substituted contract is a question of interpretation. *See Restatement (Second) of Contracts* § 279 cmt. c, § 281 cmt. e. If the original obligation is undisputed, liquidated and matured, the obligee is unlikely to accept a mere promise to satisfy the obligation, so more likely than not the agreement constitutes an accord. *See* Farnsworth, *supra*, § 4.24; *Restatement (Second) of Contracts* § 279 cmt. c, § 281 cmt. e. If the promise is to pay a lesser amount, however, a fact finder may conclude that the parties intended to enter into a new agreement, sometimes referred to as an accord and satisfaction, which extinguishes the prior obligation. *See, e.g., Emerson v. Deming*, 304 Mass. 478, 23 N.E.2d 1016 (1939) (affirming finding below that note for less than an undisputed, liquidated debt for fraud created new debt dischargeable in bankruptcy).

■ The 1997 note bears the characteristics of an accord rather than a contract substituted for the Debtor's obligation for alleged defalcation. The preexisting indebtedness for which it was given was undisputed, liquidated and matured. And the note is for the full amount of the debt accrued through August 22, 1997. The agreement accompanying the note also points toward an accord rather than a substituted contract. Instead of releasing the Debtor from his existing obligation, Shea agreed only to "forbear from bringing suit or otherwise proceeding against [the Debtor] for his breach of, and failure to comply with, the terms of the 1983 Agreement...." Also indicative of Shea's intent to hold the Debtor to his preexisting obligation is paragraph 2 of the August 22, 1987 agreement. The Debtor there agrees that "commencing with the month of August, 1987, he shall resume making monthly payments to [Shea] in accordance with the terms of the 1983 Agreement."

This case is similar to *Great American Insurance Co. v. O'Brien (In re O'Brien)*, 154 B.R. 480 (Bankr.W.D.Tenn.1993). The debtor's embezzlement had caused the plaintiff insurance company to pay out $26,606.95. It made demand upon the debtor for payment of that amount, whereupon the debtor gave it his promissory note in the sum of $26,606.95. The court ruled that no new obligation was created, holding the debt was nondischargeable under section 523(a)(4) as a debt for embezzlement.

The question is of course one of intent. That does not, however, preclude summary judgment if the evidence all points in one direction, as it seems to here. *Varrasso*, 37 F.3d at 764. I will nevertheless leave resolution of this question to trial. I do so for three reasons: (i) the question is more definitively resolved at trial, (ii) a trial is necessary anyway, and (iii) such partial summary judgment would be conditional on resolution of the trust question.

Distinguishable from this case is *Oltman v. West (In re West)*, 153 B.R. 821 (Bankr. N.D.Ill.), *aff'd*, 157 B.R. 626 (N.D.Ill.1993), aff'd, 22 F.3d 775 (7th Cir.1994). This is so for two reasons. First, the obligor in that case gave the obligee a release of all obligations except those arising under the note which he simultaneously executed. Second, the amount of the note, $75,000, was less than the $100,000 debt resulting from the debtor's embezzlement. Also distinguishable is *Rosenberg v. Robbins*, 289 Mass. 402, 194 N.E. 291 (1935). Even though the amount of the note there was equal to the pre-existing debt, the trial judge had found that the note created new indebtedness. In its affirmance the court did not rule the facts required a finding that a new contract was created. It merely held the question was one of fact and that the trial judge was within his province in making the finding he did.

Also not controlling are decisions involving the receipt and deposit of a check marked "payment in full." Because in these cases the obligor renders performance and does not merely make a promise, the original debt is extinguished; this is so even though the creditor strikes out

**224**

the words "payment in full." *See Wong v. Paisner,* 14 Mass.App.Ct. 923, 436 N.E.2d 990 (1982). Here only another promise was received.

## IV. CONCLUSION

The Debtor's motions are therefore denied. A pretrial will be scheduled by an order entered herewith. At the pretrial counsel should be prepared to discuss the possible escrowing of one-third of the monthly payments currently being made to the Debtor by Aetna.