Fabricant, Judith, J.
INTRODUCTION
This action presents an intra-family dispute regarding ownership interests in the family taxi business. The plaintiff, Antonella llacqua, seeks recovery, for herself and her minor daughters, from her father-in-law and brother-in-law, based on ownership interests she contends her late husband, Steven llacqua, held at the time of his death, as well as her own claimed ownership interest and that of one daughter. She also asserts claims against two attorneys who have provided representation to various members of the family. The defendants contend that under agreements executed by the plaintiff and Steven llacqua, they and their daughter held no beneficial interest, but instead held legal ownership only as nominees or straws for *86 the benefit of Anthony Ilacqua, Senior. Before the Court are motions of all defendants for summary judgment, along with motions of the plaintiff to postpone consideration of the summary judgment motions pending further discovery pursuant to Mass.R.Civ.P. 56(f). For the reasons that will be explained, the Rule 56(f) motions will be denied, and the summary judgment motions will be allowed.
BACKGROUND
The evidentiary record before the Court is voluminous and complex. The Court has examined it carefully. That examination reveals directly conflicting evidence on few if any points of relevance to the issues presented by the present motions. What appears, rather, is evidence of essentially undisputed facts from which the parties argue different inferences. For purposes of summary judgment, the Court must draw all reasonable inferences in favor of the opposing party. See Simplex Technologies, Inc. v. Liberty Mat. Ins. Co., 429 Mass. 196, 197 (1999). The question in this case is what inferences are reasonable. The Court will present the facts in such a way as to identify the areas of conflict.
Family history and family relationships are central to the story. Defendant Anthony Ilacqua, Senior, known as Tony, is the patriarch. His wife is Marion Ilacqua. Malcolm Portnoy is Tony’s long-time lawyer. Tony had two sons, defendant Anthony Ilacqua, Junior (known as Anthony), bom in 1964, and Steven Ilacqua, born in 1965.[1] Anthony married Joanne Crisafulli in (1988). In 1994, Steven married Joanne’s sister, Antonella Crisafulli, the plaintiff in this case. Steven and Antonella had two daughters, Victoria Rose Ilacqua, bom in 1997, and Stephanie Ilacqua, born in 2000. Steven committed suicide on December 31, 2000.
Tony has been in the taxi business since his youth. Sometime prior to the mid-1980s, he incorporated Tudor Cab, Inc., and operated his business through that entity from a location on Tudor Street in South Boston. His two sons joined him in the business as teenagers, and continued working in it thereafter, Anthony to the present and Steven until his death. Over a period of decades, the business acquired ownership of a number of taxi medallions.[2]
In the mid-1980s, Tony and Attorney Portnoy devised a plan, as described in Tony’s affidavit, “to manage the liability exposure presented by ownership of numerous medallions and to insure that adequate insurance could be obtained.” The plan, again as described in Tony’s affidavit, was that “numerous companies would be incorporated and none would hold more than three medallions ... The stock in each company would be issued to a family member, subject, in all instances, to nominee agreements . . . under which I [Tony] would retain beneficial ownership and control of the Companies.” Portnoy’s deposition testimony provides a similar description; the plan was to “try and protect Tony’s assets from being involved in case there was a disastrous loss in one of the corporations which was not covered by sufficient insurance, and that by setting them up in different corporations, it was one step that would help to segregate and protect them, but that it was always Tony’s intention to own them and control them.”
According to Tony’s deposition testimony, he discussed the plan with “everybody in the family,” including both his sons, his wife, and his mother and sister, and explained that the plan would involve the use of their names. All of them agreed to the plan. He took each family member, including both sons, Antonella, and Joanne, to Portnoy’s office, where Portnoy explained the plan to them in his presence. Portnoy, Marion, and Anthony all confirm that account.[3]
To implement that plan, over the next approximately fifteen years Portnoy formed a number of separate corporations, each of which would hold one, two or three medallions. In each instance, a family member was designated as sole officer and director of the corporation, and all stock in the corporation was issued to that family member.[4] Tudor Taxi then transferred one or more medallions to that corporation, or the corporation acquired one or more medallions from other sources, with consideration paid by Tony, Tudor, or another affiliated entity. Papers were filed with the Secretary of State’s Office reflecting establishment of the corporations, and annual reports were filed thereafter. Portnoy prepared the incorporation papers and reports. In each instance the document bears a signature purporting to be that of the appropriate corporate officer. Who actually signed is unclear. According to Tony’s and Anthony’s deposition testimony, the various family members had an understanding that any of them, or Portnoy or Orlov, could sign any of their names. Tax returns were filed in the name of each corporation, reflecting ownership in accord with the corporate documents. The returns were prepared by accountant Jason Orlov, who provided accounting services for the business regularly over the years.
In each instance, Tony and the designated family member entered into an agreement in essentially.the same form. Defendants refer to these as “nominee” or “straw” agreements; the Court will use that nomenclature where convenient, without intending thereby to adopt any characterization. Illustrative of the agreements is one entered into by Joanne Crisafulli (then Anthony’s fiancee), dated January 11, 1988. That agreement recites that Tony is the sole stockholder of Tudor, that Joanne is engaged to Anthony, who is an employee of Tudor and “derives economic benefit therefrom,” that Tony “desires to acquire[5] additional assets of said Tudor Cab, Inc. to wit: Hackney Carriage Medallions to other corporations to minimize the effect of not being able to obtain sufficient insurance coverage to protect said assets,” and that “it is to the mutual advantage of both parties that the stock in said trans *87 feree corporation not be in the name of said Anthony J. Ilacqua.” The document goes on to set forth the agreement of the parties to it (that is, in this instance, Tony and Joanne) that “a new corporation organized for the purpose of receiving said asset namely Waterfront Taxi, Inc., although listed to the name of said Joanne Crisafulli as owner of the capital sock in said corporation is, in fact, that of Anthony J. Ilacqua who is the true and lawful owner of said stock.” The document goes on to state Joanne’s agreement that “I shall, at any time requested, sign any and all documents necessary as well as do all things necessary to transfer said stock into the name of said Anthony J. Ilacqua. I further empower said Anthony J. Ilacqua as my agent to execute all documents necessary in my name on my behalf to accomplish the same.”
The agreements were executed at various times, with various persons present, usually one or more of Tony, Anthony, Marion, and Portnoy. Some were executed at Tony’s home, others at Portnoy’s office. On the occasions when Portnoy was present, according to his deposition testimony, he explained the effect of the agreement. In the context of this litigation Joanne,[6] Anthony, and Marion have all acknowledged their signatures on their agreements, and their understanding of the effect of the agreements.[7]
Among the corporations established were three with Steven Ilacqua identified as sole officer, director, and shareholder: Shadow Taxi, Inc., formed in 1986; V.R.I Taxi, Inc., formed in 1998; and S.D.I. Taxi, Inc., also formed in 1998.[8] Also among the corporations were Legal Taxi, Inc., formed in 1989, with Antonella Crisafulli[9] identified as sole officer, director, and shareholder; and Seventh St. Taxi, Inc., formed in 1998, with Victoria Rose Crisafulli identified as sole officer, director, and shareholder.[10] With respect to each of these entities, defendants offer documents, substantively identical to the agreement described supra, bearing signatures in the name of the person designated as sole officer, director, and shareholder of the corporation. The issue of authenticity of these documents is at the heart of the case.[11]
With respect to Shadow Taxi, Inc., the defendants offer a document, dated November 21, 1986, bearing what purports to be the signature of Steven Ilacqua. The document recites that Steven “derives economic benefit as an employee of said corporation [Tudor Cab, Inc.) and is the son of Anthony J. Ilacqua,” that Tony “desires to distribute” assets of Tudor “to minimize the effect of not being able to obtain sufficient insurance coverage to protect his assets,” that the parties therefore agree that the stock in Shadow Taxi, Inc., “although listed to the name of Ilacqua as owner is in fact that of Anthony J. Ilacqua is who is the true and lawful owner of said stock,” that Steven will transfer the stock to Tony whenever requested, and that Tony may execute any documents necessary to do so. Corresponding documents are offered for V.R.I. and S.D.I., dated July 1998, and December 11, 1998, respectively. Tony, Anthony, and Portnoy have all testified that they discussed the agreements and their purpose and effect with Steven many times, and that Steven acknowledged that Tony retained actual ownership of the stock in each company.
Tony has reported in interrogatory answers that he, Portnoy, and Marion witnessed Steven sign the Shadow agreement, that Anthony witnessed Steven sign “at lease one” of the agreements, and that “consistent with my practice at the time” Steven’s signatures on each of the other agreements “would have been witnessed by me, Malcolm Portnoy, or both.” At his deposition, Tony testified that he witnessed Steven’s signature “every single time” he signed an agreement. Portnoy’s interrogatory answer indicates that he was not present at the signing of “most” of the agreements. At his deposition, however, he testified that he specifically remembered that Steven signed one of the agreements at his office in his presence, after full explanation of it, and that Tony and Anthony were also present.
Marion has testified that she was present when Steven signed in Portnoy’s office in 1986, and that she and Anthony also signed agreements in the same meeting. Anthony’s answers to interrogatories and deposition testimony reflect no recollection of whether he witnessed Steven’s signatures, but he does recall signing an agreement himself in November of 1986, at Portnoy’s office, after a discussion with his father and Portnoy, and that Marion was also present and Joanne may have been as well.
As for the plaintiff, she is able to say only that she was not present when Steven signed any of the agreements, that she is unable to confirm or deny that the signatures are his, and that she is not aware of any facts that would lead her to believe that Steven had not signed the agreements.
With respect to Seventh St. Taxi, Inc., defendants offer a substantively identical agreement, dated October 1998, bearing a signature in the name of Victoria Rose Crisafulli. Tony reports in an interrogatory answer that he and Marion were present when Steven signed the document in Victoria’s name. The plaintiff does not contradict that evidence; her only testimony on the subject is that she does not know whether Steven did so.
With respect to Legal Taxi, Inc., defendants offer two documents, both substantively identical to the other nominee agreements, both bearing a signature in the name of Antonella Crisafulli. Both are dated January 1989, without a specific date. Both recite, inaccurately, that Antonella resides at 20 Hilltop Street, Milton; that address is Tony’s. Both also recite, inaccurately, that Antonella “derives economic benefit as an employee of said corporation [Tudor].” The difference between the two is that the first identifies Antonella, incorrectly, as Anthony’s mother-in-law; *88 the second identifies her correctly as his sister-in-law.[12] Tony’s initial interrogatory answer reports that he does not have a specific memory as to who witnessed Antonella sign these agreements, but that it was his practice that he or Portnoy, or both, would have been present. A supplemental answer identifies Marion and himself as witnesses. At his deposition, Tony testified that he witnessed Antonella sign both of the agreements, one at his home and one at Portnoy’s office. Portnoy testified at his deposition that he was present when Antonella signed an agreement, along with Tony, Marion, Steven, and Anthony, and further that it was his practice to provide the signatories of an agreement with an explanation of the agreement’s meaning, and that he assumes he did so for Antonella. Marion’s deposition testimony confirms both Tony’s and Portnoy’s. She recounts that Antonella signed the first document at Portnoy’s office, at a meeting both Marion and Tony attended, during which Portnoy provided a full explanation of its meaning, and An-tonella acknowledged her understanding. According to Marion’s account, Antonella signed the second document about a month later, to correct the misidentifi-cation of the family relationship; Marion, Steven and Tony were all present on that occasion. Anthony confirms his presence at that signing in a supplemental interrogatory answer, although his initial answer indicates a lack of personal knowledge as to who witnessed Antonella’s signatures.
Antonella does not deny signing these documents. Her position, expressed in her affidavit and deposition testimony, is that she does not remember signing them, and does not remember discussions of them, but that the signatures looks like hers, and that she would have signed such documents if Tony asked her to do so.
The Hackney Division of the Boston Police Department regulates taxis in the City of Boston, and requires the filing of various forms reflecting ownership and transfers of medallions or of stock in corporations owning medallions. Over the years, the Ilacqua family taxi business has filed many such documents, each reflecting ownership in accord with the corporate documents described supra — that is, for example, Steven as owner of Shadow, with its medallions, Antonella as owner of Legal, with its medallions, and so on. The record includes a sampling of such documents. Portnoy prepared these documents for filing. Each bears a signature purporting to be that of the owner. As in the case of the corporate documents filed with the Secretary of State, who actually signed in each instance is unclear. The so-called nominee or straw agreements were never disclosed to the Hackney Division. [13] Captain Donald Devine, who headed that office from 1985 to 1992, believed that Tony, Anthony, and Steven all were owners.[14]
In addition to the various publicly filed documents discussed supra, the corporations submitted applications for insurance coverage and related documents. These documents, also, reflected ownership in accord with the corporate arrangements, and did not disclose the nominee agreements or the “true” ownership as reflected in those agreements. Correspondence in 1994 between Portnoy and the insurance agent for the business refers to “Middlesex Insurance Company’s action in experience rating the above corporations [Legal and Shadow] as one entfiy.” Portnoy’s letter encloses “a list which contains the name of the president, board of directors and sole stockholder of each corporation which supports the position that these corporations are owned separately and distinctly and have no legal connection to each other and therefore . . . should not be experience rated as one entity.” In correspondence to Tony later that year, Portnoy reported that “all Taxi cabs are being experience rated for 1994 but they are being done on an individual company basis which, in the long run, should result in a lower total cost of insurance for the above [listed companies]. If all the above were combined into one fleet this could lead to a combined positive modification which in turn would raise the total cost of your insurance.” A fact-finder could fairly infer that separation of nominal ownership resulted in lower insurance premiums than would have been due under Tony’s sole ownership, at least for 1994.
Tony and his sons managed the business of all the various corporations through T.A.S. Taxi Management, Inc., which Tony incorporated in 1986.[15] The three were employees of T.A.S. and received their income from it. T.A.S. would collect the revenues for each corporation, in the form of lease payments from taxi drivers, and then write checks to the individual corporations, from which they would pay their separate expenses. T.A.S. also made loans to the various corporations for the purchase of medallions, and held liens on the medallions.[16] Although Tony has testified that he was sole owner of T.A.S., minutes of a December 9, 1986, directors meeting reflect a vote by Tony, as sole director, to issue one hundred shares of stock, fifty to himself, twenty-five to Steven, and twenty-five to Anthony.[17] Nothing in the record indicates that either Anthony or Steven ever paid any consideration for such stock, or ever invested in T.A.S. other than by working in the business.
The plaintiff does not contend that, at any time before this litigation, she believed that she or her daughter owned stock in any taxi company, or that she ever played any active role in the management of any such company. To the contrary, she asserts in her affidavit that she is unsophisticated, that in her relationship with Steven she was “a traditional Italian girlfriend/wife,” and that she was “largely in the dark” with respect to the taxi business. She does contend that she believed that her husband owned taxi medallions. She bases that contention on his statement to her on one or more occasions that “he owned taxi *89 medallions and we were all set,’’ and on the couple’s prenuptial agreement. That document, prepared by Portnoy and dated September 9, 1994, provided that each spouse waived any claim on the other’s separate assets. Appended were schedules of assets. Steven’s listed “Shares of Stock in Shadow Taxi, Inc.,” with an “approximate fair market value” of “$160,000.” Antonella’s listed no assets, although she was the record owner of the stock of Legal Taxi, Inc.[18] According to Antonella’s deposition testimony, at the time of Steven’s death she was unaware of any ownership interest he may have had in the taxi business other than through Shadow. In particular she was unaware ofS.D.I. and V.R.I.
Steven died intestate. An administrator of his estate was needed. Portnoy, who was in Florida for the winter, contacted Attorney Michael Cook, with whom he shared office space.[19] With Antonella’s assent, Cook took the steps necessary to arrange for Tony’s appointment as administrator. Those steps included obtaining Antonella’s appointment as guardian for her daughters, so that she could consent on their behalf, as well as her own, to Tony’s appointment. She did so. Acting as administrator, Tony distributed to Antonella the few assets in Steven’s name other than stock in taxi companies.[20]
After Tony’s death, Antonella and her children lived with Anthony and Joanne for a period of about six months. Tony paid for the funeral, and provided funds to Antonella for personal expenses. T.A.S. provided health insurance for Antonella and the children for the next five years. Tony estimates the value of that benefit at $50,000.
Sometime shortly after Steven’s death, according to Antonella’s affidavit and deposition testimony, Tony and Anthony removed from her home a safe and filing cabinet containing business and personal papers. Her affidavit asserts that “I was given a few items back from these materials, but for the most part I never saw the contents again.” In her deposition testimony, however, she acknowledged that the safe and filing cabinet were both returned to her, and that she does not know of anything that had been contained in them that was not returned.
From the time of Steven’s death until 2004, corporate documents of the types discussed supra continued to be prepared, signed, and filed, as before, with signatures in Steven’s name and those of Antonella and Victoria Rose Crisafulli. In 2004, documents were executed and filed transferring the stock in Shadow, V.R.I., S.D.I., Legal, and Seventh St. into Anthony’s name, and substituting him as sole officer and director of each corporation. These documents bear signatures purporting to be those of Steven (for Shadow, V.R.I. and S.D.I.), Antonella (for Legal), and Victoria Rose Crisafulli (for Seventh St.). Portnoy prepared the documents; who signed them is unclear. Hackney Division forms for transfers inquire as to the reason and the purchase price; Portnoy entered “Estate Planning,” and “Gift for Estate Planning Purposes.” His cover letters to the Hackney Division referred to each transfer as “an interfamily transaction being completed for Estate planning purposes.” Similar language appears in clerk’s certificates of corporate votes approving the transfers, signed in Anthony’s name.[21] Tony and Anthony signed nominee agreements, similar to those discussed supra, acknowledging that Tony was the “true” owner, and that Anthony would transfer the stock to Tony upon request.[22]
In 2001, Tony was named as a defendant in a personal injury suit, referred to as the McKeon case, arising from a collision involving a taxi operating under a medallion owned by Blazer Taxi, Inc., a corporation formed pursuant to the plan discussed supra, in the name of Tony’s sister, Dorothy Raimondi. The suit was eventually settled for $250,000, some of which Tony paid personally, according to his deposition testimony in this action. At his 2002 deposition in the McKeon case, Tony described the operations of T.A.S. He testified that T.A.S. managed some forty taxis owned by various corporations owned by various people, and that all profits of all but one of the companies, including Blazer Taxi, go to T.A.S. T.A.S. also, he explained, made loans to the various corporations to purchase cabs and medallions.[23] He was asked which of the corporations he had formed, and identified four: “Bright, Dipper, Star, South Boston.” At the continuation of his deposition in December 2003, Tony testified that in September 2002, at the suggestion of his insurance agent to avoid a premium increase, he had transferred the medallions previously owned by Blazer Taxi to a newly formed corporation of which he was sole owner, and that on many other occasions over the years he had sold medallions, or transferred them to new corporations, for insurance purposes. Neither Blazer nor Dorothy Raimondi, the listed owner of its stock, received any proceeds from its transfer of medallions, although the transfer relieved Blazer of a debt to T.A.S. Asked to list the taxi companies whose stock he owned, Tony identified three: “South Boston, A.J.I. [the transferee from Blazer] and there’s one more. I can’t think of the name.” He did not disclose the nominee agreements or his beneficial ownership of the various corporations under those agreements.
The relationship between Antonella and the Ilacqua family began to break down sometime in 2005. Tony attributes the breakdown to her limiting the family’s access to her daughters after she developed a new romance, and his disapproval of her putting her new boyfriend’s name on the deed to a new home she was purchasing with proceeds of the sale of the home she had owned with Steven. Antonella connects the breakdown to Tony’s announcement in September 2005, that T.A.S. would no longer provide health insurance for her and the children.
*90 Antonella brought this action on April 5, 2006. Her complaint asserted fourteen counts, all of which, in substance, alleged that Tony and Anthony, with assistance from Portnoy and Cook, converted assets from Steven’s estate. With the complaint she filed an ex parte motion for temporary restraining order, which the Court (Gants, J.) allowed, ordering all defendants to refrain from transferring assets and from issuing stock in Shadow, V.R.I. and S.D.I. The Court continued that order in effect as a preliminary injunction after a hearing on April 12, 2006, but after further hearing on June 30,2006, the Court vacated the order as to Cook, and narrowed it as to all other defendants to bar only transfers of real property and taxi medallions, and other transfers over $10,000 outside the ordinary course of business and without fair consideration.
The plaintiff amended her complaint on October 30, 2006. That amended complaint, which is now the operative pleading, sets forth nineteen counts, as follows: conversion against Tony and Anthony (count I, relating to Shadow, V.R.I. and S.D.I, and count II, relating to Seventh St. and Legal), unjust enrichment against Tony and Anthony (count III), constructive trust against Tony and Anthony (count IV), breach of fiduciary duty against Tony (countV), aiding and abetting against Tony and Portnoy (count VI), civil conspiracy against Tony, Anthony and Portnoy (count VII), legal malpractice against Portnoy and Cook (counts VIII and XI), accounting against Tony and Anthony (counts IX and X), vicarious liability against Cook and Michael K. Cook, P.C., for conduct of Portnoy (count XII), claims for attachment against property of all defendants (counts XII, XIV, XV, XVI, XVII), violation of G.L.c. 93A against all defendants (count XVIII), and declaratory judgment (count XIX).
Tony, Anthony, and Portnoy have filed a joint motion for summary judgment, arguing that the undisputed facts establish the authenticity and enforceability of the nominee agreements, and that those agreements by their plain terms establish that neither Steven nor Antonella or her daughters ever had any ownership interest in any of the corporations. On that basis, they contend, all counts of her complaint must be dismissed. Cook and his professional corporation (hereinafter, jointly, “Cook”) have filed a separate motion for summary judgment. They join in the arguments of the other defendants, and argue also that the undisputed facts establish no negligence on his part, and no basis for vicarious liability for any conduct of Portnoy. Antonella agrees that the issue of whether any genuine factual dispute exists with respect to authenticity of the nominee agreements is ripe for determination at this time. As to all other issues, however, she invokes Mass.R.Civ.P. 56(f), arguing that she cannot fully respond without further discovery.
DISCUSSION
I. The Standard
This Court grants summary judgment where there are no genuine issues of material fact and the record entitles the moving party to judgment as a matter of law. See Mass.R.Civ.P. 56(c); Cassesso v. Commissioner of Correction, 390 Mass. 419, 422 (1983); Community National Bank v. Dawes, 369 Mass. 550, 553 (1976). The moving party bears the burden of establishing the absence of a genuine dispute of material fact on every relevant issue. See Pederson v. Time, Inc., 404 Mass. 14, 16-17 (1989). A party moving for summary judgment who does not bear the burden of proof at trial may demonstrate the absence of a genuine dispute either by submitting affirmative evidence negating an essential element of the non-moving party’s case, or by showing that the non-moving party has no reasonable expectation of proving an essential element of its case at trial. See Flesner v. Technical Communications Corp., 410 Mass. 805, 809 (1991); Kourouvacilis v. General Motors Corp., 410 Mass. 706, 716 (1991).
Once the moving party has established the absence of a triable issue by either of these methods, the party opposing the motion must respond with evidence of specific facts establishing the existence of a genuine dispute. Pederson v. Time, Inc., 404 Mass. at 17. The opposing party may not rest on the allegations of the pleadings, or rely on “bare assertions and conclusions.” Key Capital Corp. v. M&S Liquidating Corp., 27 Mass.App.Ct. 721, 728 (1989). Mere contradictions of factual allegations, without evidentiary support, are insufficient to raise questions of material fact sufficient to defeat a summary judgment motion. Madsen v. Erwin, 395 Mass. 715, 721 (1985), quoting Olympic Junior, Inc. v. David Crystal Inc., 463 F.2d 1141, 1146 (3rd Cir. 1972) (noting that conclusory statements, denials, and allegations are insufficient to raise material issues of fact). The opposing party’s obligation, rather, is to demonstrate the existence of admissible evidence sufficient to meet its burden of proof on the issues raised by the motion.
In deciding motions for summary judgment, the Court may consider pleadings, depositions, answers to interrogatories, admissions on file and affidavits. The Court reviews the evidence in the light most favorable to the non-moving party, but does not weigh evidence, assess credibility or find facts. See Simplex Technologies, Inc., 429 Mass. at 197; Dawes, 369 Mass. at 553; Mass.R.Civ.P. 56(c); Colley v. Benson, Young & Downs Ins. Agency, Inc., 42 Mass.App.Ct. 527, 528 (1997); see also Kelley v. Rossi, 395 Mass. 659, 663 (1985).
Under Mass.R.Civ.P. 56(f), a court will defer consideration of a summary judgment motion “if the party opposing a summary judgment motion shows that it cannot, without further discovery, ‘present by affidavit facts essential to justify [its] position.’ ” Common *91 wealth v. Fall River Motor Sales, Inc., 409 Mass. 302, 307 (1991). A party relying on this rule must show that the discovery planned will address the issue raised in the summary judgment motion. “One common reason for the denial of a continuance in this context is the irrelevance of further discovery to the issue being adjudicated in summary judgment.” Id. at 308.
II. The Ilacqua Defendants’ and Portnoy’s Motion for Summary Judgment
A. Authenticity of the Agreements
A party who offers a document in evidence must prove its authenticity. See generally, M.S. Brodin & M. Avery, Massachusetts Evidence, §9.1 at 580 (8th ed. 2007). “Such proof of authenticity usually takes the form of testimony from a qualified witness that either: (1) the document is what its proponent represents it to be; or (2) circumstances exist that imply that the thing is what its proponent represents it to be.” Commonwealth v. Wheeler, 42 Mass.App.Ct. 933, 935 (1997), quoting W.B. Leach & P.J. Liacos, Massachusetts Evidence 265 (4th Ed. 1967). This requirement is satisfied by evidence sufficient to support a finding that the matter in question is what its proponent claims. See Proposed Mass.R.Evid. 901(a). Here, the parties agree that discovery is complete with respect to authenticity of the agreements. As the recitation cited supra reflects, the evidence on this issue is decidedly one-sided. The defendants offer the documents themselves, along with eyewitness testimony to the signatures on the agreements for Shadow, Seventh Street, and Legal, as well as testimony to the practice of signature in the presence of Tony and/or Portnoy, and testimony to multiple discussions about the agreements with each of Steven and Antonella. Further, they place these agreements in the context of the overall plan involving multiple family members, the existence of which is corroborated by the testimony of Marion and Joanne, and the existence of which the plaintiff does not contest. Finally, they cite Antonella’s own testimony that the signature purporting to be hers indeed looks like hers, and that she would have signed such a document if asked to do so.
The plaintiffs response does not include any direct evidence in contradiction. She relies on claimed inconsistencies in the testimony regarding the witnessing of signatures, as well as on the various public filings and other documents and statements, discussed supra, attributing ownership to the persons identified as holding the stock in the corporations. She points out also that jurors are competent to evaluate authenticity, including by examining handwriting. See Commonwealth v. O’Connell 438 Mass. 658, 662-63 (2003); Buker v. Melanson, 393 Mass.App.Ct. 325, 330 (1979).
The public filings and other documents and statements regarding ownership do not assist the plaintiff, because they are entirely consistent with the defendants’ version of events. The objective of the plan devised by Tony and Portnoy was to create a public impression of ownership separate and different from Tony’s actual ownership as agreed to within the family — that is, in the language of trusts, to separate legal from beneficial ownership. The various corporate documents, tax returns, filings with and statements to the Hackney Division, and submissions to insurers, indicate only that the defendants did present the intended public impression; these materials indicate nothing about what occurred behind the scenes, or about the authenticity of the agreements.
The plaintiff points to her prenuptial agreement with attached financial statements, in which Steven acknowledged ownership of Shadow, and she waived any claim on such properly. That document, like the corresponding agreement between Anthony and Joanne, was prepared by Portnoy, Tony’s longtime lawyer, for the obvious purpose of safeguarding assets of the Ilacqua family business against any future claim by a disaffected spouse. Disclosure of Stephen’s record ownership served that purpose by placing Shadow squarely within the category of assets to which Antonella waived any claim. The omission of Legal from Antonella’s disclosure, and the corresponding omission of Waterfront from Joanne’s disclosure, confirm that interpretation; the documents are consistent with all parties’ understanding that both women’s ownership was nominal only, and that no need existed to protect such ownership from potential future claims by Tony’s sons.
The plaintiff points also to her testimony that Stephen told her that he owned taxi medallions. That testimony provides no context to the statement, from which a fact-finder could determine the nature of the ownership referred to. There is no question that Steven held record ownership of corporations that owned taxi medallions, as did Antonella herself. Such ownership is not inconsistent with authenticity of the agreements.
With respect to the testimony regarding witnessing of signatures, as the recitation of evidence set forth supra reflects, the Court has carefully examined the claimed inconsistencies. What appears, in substance, is that as discovery proceeded from initial answers to interrogatories through supplemental answers and depositions, the defendants provided additional information. Although in some instances deposition testimony contradicts earlier assertions of lack of knowledge or memory, the information provided by each witness is consistent with that provided by other witnesses, and with the. documents themselves and the overall plan and practice as described by all the witnesses. The Court is not convinced that the inconsistencies are such as to give rise to a genuine factual dispute.
A fact-finder is not, of course, required to believe the testimony of any witness, and an earlier claim of lack of memory is certainly among the factors a fact-finder could properly consider in evaluating credibil *92 ity. Here, however, there is simply nothing on the other side; no evidence contradicts the testimony of the witnesses who claim to have observed the execution of the agreements. To the contrary, the plaintiffs own testimony supports authenticity. With respect to the Legal agreement, she acknowledges that the signature looks like hers, and that, although she has no memory either way, she would have signed if asked. As to Steven’s purported signatures, she does not opine that the signatures do not look like his, with which she surely would have been familiar; she can say only that she lacks knowledge. Jurors are competent to evaluate handwriting, but the record presented here identifies no evidence from which a jury could determine that the handwriting is not genuine. Accordingly, the Court concludes that no genuine factual dispute exists with respect to authenticity of the agreements.
B. Interpretation and Enforcement of the Agreements
With authenticity established, the Court must turn to questions of interpretation and enforcement of the agreements. Defendants contend that each agreement establishes an express trust, under which Tony was the sole beneficial owner of all stock in each corporation. On that basis, they argue, all the plaintiffs’ claims must fail, because all are premised on the theory that she, Steven, or Victoria had actual beneficial ownership interests. Plaintiffs response takes two forms. First, she moves to postpone consideration of the summary judgment motion pending further discovery, pursuant to Mass.RCiv.P. 56(f). Second, she argues, alternatively, that the agreements are unenforceable due to fraud or estoppel, or that the agreements have been modified.
Plaintiffs motion under Rule 56(f) is supported by an affidavit of her counsel, identifying discovery he proposes to take, consisting of a list of depositions as well as motions to compel materials withheld as privileged.[24] The proposed discovery, counsel asserts, will address the plaintiffs contention that the agreements “are not integrated or unambiguous,” “the true nature of these transactions and the surrounding role of T.A.S. Taxi Management, Inc.,” “changes to the agreements evidenced by the parties’ statements and conduct,” “fraud perpetrated by the defendants,” “(t]hat the defendants are estopped from denying that the plaintiffs own the stock in question,” and “new claims involving T.A.S. that have been revealed through discovery.”
The last of these topics is not a proper subject of discovery in this action, until such time as the Court might allow the plaintiffs pending motion to amend her complaint to assert new claims relating to T.A.S. The other topics do bear on the issues presented by the claims pled, but the motion and affidavit do not show that the proposed discovery is likely to illuminate these issues, or that the plaintiff cannot fully respond to the motion for summary judgment without the proposed discovery. Whether the agreements are integrated and unambiguous is a matter to be determined based on the documents themselves, not based on anything any of the proposed deponents might say. The nature of the transactions is certainly central to the issues, as would be any changes that might have occurred to the agreements, but nothing before the Court indicates any reason to believe that the proposed deponents will provide information on those questions that has not already been provided by the surviving parties and witnesses to the transactions, all of whom have been deposed. As to fraud and estoppel, as will be discussed infra, any events that would support such theories would have to involve representations made to the plaintiff herself, who would be in a position to testify to them.[25] The Court understands counsel’s desire to leave no stone unturned, but is not persuaded that there is any reason to expect the proposed discovery to generate evidence material to the plaintiffs claims. Accordingly, the plaintiff s motion under Rule 56(f) will be denied.
The Court therefore turns to the meaning and effect of the agreements. The defendants argue that each agreement creates an express trust, under which the person named as owner of the stock in the newly formed corporation, to which medallions are transferred, holds the stock in trust for Tony. Based on the plain language of the documents, the Court agrees. Courts recognize the creation of a trust where a legal estate is vested in one person to be held on behalf of another. See Ventura v. Ventura, 407 Mass. 724, 726 (1990), citing Cooney v. Montana, 347 Mass. 29, 35 (1964). No particular form of words is necessary, but the words employed must unequivocally show the parties’ intention. See Cooney, 347 Mass. at 35.
Here, each agreement provides for the transfer of medallions from an entity owned by Tony to a corporation, and for the stock of that corporation to be issued in the name of Steven, Victoria, or Antonella. Each agreement goes on to provide, however, that Tony “is the true and lawful owner of said stock,” and that the person in whose name the stock is issued will “at any time requested, sign any and all documents necessary as well as do all things necessary to transfer said stock” into Tony’s name, and further, that Tony is authorized to do so as agent. These terms are clear and unequivocal, leaving no doubt that the person to whom the stock is issued is a mere nominee, holding the stock not for his or her own benefit, but on behalf of Tony. Each agreement unequivocally manifests the parties’ intent to create an express trust.
The parties devote considerable attention to arguments regarding whether parol evidence should be admitted with respect to interpretation of the agreements. Parol evidence consists of prior or contemporaneous written or oral communications that contradict, vaiy or broaden a written instrument. See Kobayashi v. Orion Ventures, Inc., 42 Mass.App.Ct. *93 492, 496 (1997). Parol evidence is inadmissible where a written instrument is integrated, in the sense that it is a complete and exclusive expression of the parties’ agreement. See Cabot v. Cabot, 55 Mass.App.Ct. 756, 763 (2002). Such integration is presumed where an agreement appears on its face to be a complete and exclusive expression of the parties’ agreement and where there is no evidence to the contrary. See Robert Indus., Inc. v. Spence, 362 Mass. 751, 754 (1973). This presumption of integration, however, does not apply where the written instrument is manifestly ambiguous. See KobayashL, 42 Mass.App.Ct. at 496; see also Hebb v. Welch, 185 Mass. 335, 336 (1904). An instrument is ambiguous when its language is reasonably susceptible of more than one meaning. See Nelson v. Cambridge Mut. Fire. Ins. Co., 30 Mass.App.Ct. 671, 673 (1991), quoting Jefferson Ins. Co. v. Holyoke, 23 Mass.App.Ct. 472, 474-75 (1987).
Here, the language of each agreement is clear and unequivocal, complete on its face, and reasonably susceptible of only one meaning. Accordingly, the Court would not admit parol evidence to vary or contradict the language of the agreements. Perhaps more to the point, however, none is offered. The plaintiff does not claim to have evtdence of any communications, oral or written, between the parties to any of the agreements, or any statements by any of the parties to them, regarding their meaning. The only evidence offered regarding the meaning of the agreements is the agreements themselves. What the plaintiff does offer is the various statements discussed supra, in documents and otherwise, regarding ownership. For the reasons already discussed, these statements do not conflict with interpretation of the agreements as establishing express trusts, according to their plain terms.
The plaintiff contends that there is evidence from which a jury could determine that the agreements were modified, so as to confer full ownership on Steven, Victoria and Antonella. For this theory she cites Captain Devine’s testimony that Tony said “that he was going to get out of the business” and that he was “grooming Anthony and Steven to take over the business.” Those statements make no reference to the agreements, and provide no basis for a finding that the agreements were ever modified.
The plaintiff argues that the agreements are unenforceable because they aim to perpetrate a fraud. The purpose of the agreements is stated quite plainly on their face: “to minimize the effect of not being able to obtain sufficient insurance coverage to protect said assets.” Put differently, the purpose is to minimize the possibility that, in case of a judgment against Tony exceeding insurance coverage on the particular vehicle involved, a judgment creditor would be able to seize the medallions being transferred under the agreements. To accomplish that purpose, Tony would have to hide the fact that, under the agreements, he remained the “true and lawful owner” of the stock in all the corporations owning all the medallions — as he apparently did in the McKeon case in 2002 and 2003. In that respect, although the agreements do not in themselves effect any fraud, they do contemplate the potential commission of a fraud, at some time in the future, against some potential claimant or judgment creditor, in connection with potential claims that had not arisen at the time of execution of the agreements. Neither Steven, Victoria, nor Antonella, however, was or would have been the victim of any such fraud. To the contrary, to the extent that such fraud would preserve the family business that provided their livelihood, they would benefit from it.[26]
Generally, a conveyance fraudulent as against creditors is effective between the parties. See Lufkin v. Jakeman, 188 Mass. 528, 532 (1905). A court will not, however, aid a party in the execution of a fraudulent scheme, or in the enforcement of an executory contract that rests directly and solely on fraud. See id. For that reason, the parly seeking enforcement must show a prima facie right to recover on the face of the contract without developing the fraud in the transaction. See Murphy v. McKenzie, 1 Mass.App.Ct. 553, 558 (1973). Where the party seeking enforcement cannot show any right or title without first showing conveyance of the property in fraud of creditors, the court cannot lend its aid to relieve that party from the consequences of the fraud, but will leave the parties where their fraudulent undertakings place them. Caines v. Sawyer, 248 Mass. 368, 374 (1924).
Here, enforcement of the agreements does not depend on proof of any fraudulent transaction or purpose. The agreements explicitly recognize Tony as “the true and lawful owner” of the stock in each corporation, and grant him the right to compel, and to effectuate as agent, execution of any documents necessary to transfer the stock to his name. Recognition ofTony’s ownership by the Court does not aid any fraud.
The plaintiff also argues that the Tony is equitably and judicially estopped from claiming ownership of the stock in the defendant corporations. As to equitable estoppel, they cite the “numerous written and oral representations to the contrary” in the various documents and statements discussed supra. As to judicial estoppel, they cite Tony’s deposition testimony in the McKeon case.
To support a claim of equitable estoppel, the plaintiff would have to show that: (1) Tony made a representation intended to induce a particular course of conduct by the plaintiff: (2) the plaintiff took action based upon the representation: and (3) the plaintiff suffered a detriment as a result. See Céllucci v. Sun Oil Co., 2 Mass.App.Ct. 722, 728 (1974). Here, the evidence the plaintiff offers does not support any of those elements. None of the representations made by or on behalf of Tony was directed to her, Steven or Victoria, nor does any evidence suggest that she relied on any *94 representation as to ownership of the stock.[27] The plaintiff has failed to identify any facts from which equitable estoppel might arise. Judicial estoppel precludes a party from asserting a position in one legal proceeding that is contrary to a position it has previously asserted successfully in another proceeding. See Otis v. Arbella Mut. Co., 443 Mass. 634, 639-40 (2005), quoting Blanchette v. School Comm. of Westwood, 427 Mass. 176, 184 (1998). The purpose of the doctrine is to prevent litigants from manipulating the judicial process. See Otis, 443 Mass. 640, quoting Canavan’s Case, 432 Mass. 304, 308 (2000). The doctrine is properly invoked whenever a party seeks to use the judicial process in an inconsistent way that courts should not tolerate. Otis, 443 Mass. 640, quoting East Cambridge Sav. Bank v. Wheeler, 422 Mass. 621, 632 (1996). While those circumstances are not reducible to any general formula, two fundamental elements have emerged: A party asserting judicial estoppel must show that (1) the opposing party’s position is directly inconsistent with its position in a prior proceeding; and (2) the opponent succeeded in the prior proceeding in convincing the court to accept its position. See Otis, 443 Mass. at 640-41; see also Fay v. Federal Nat’l Mortgage Ass’n., 419 Mass. 782, 788 (1995). Settlement of the prior proceeding without adjudication of the contention in issue does not meet the element of successful assertion of the litigant’s position. See East Cambridge Sav. Bank, 422 Mass. at 623; Yun Ku v. Town of Framingham, 53 Mass.App.Ct. 727, 729 (2002); see also Fay, 419 Mass. at 788.
Here, the plaintiff relies on Tony’s deposition testimony in the McKeon case regarding ownership of Blazer Taxi, Inc. Although that testimony did not address the ownership of the corporations in issue here, it did, at least implicitly, express the view that record ownership of stock in the corporations he established in connection with the taxi business he ran was real ownership, as opposed to the merely nominal character he now ascribes to it. In that respect, his testimony there was inconsistent with the position he takes here. The evidence does not establish judicial estoppel, however, because nothing indicates that his position in that case was successful; to the contrary, the case was settled without adjudication.[28]
The plaintiffs final theory is that the defendants have committed spoliation of evidence, and that on that basis a fact finder could draw inferences adverse to their position. The basis of the theory is the plaintiffs testimony that Tony and Anthony removed Steven’s personal and business records from her home after his death. The plaintiffs deposition testimony refutes this theory; she acknowledges that she has no evidence that any materials that were removed were not returned. No basis for a finding of spoliation exists.
The record presented therefore establishes the absence of any genuine dispute of material fact with respect to the plaintiffs claims against the Ilacqua defendants and Portnoy. These defendants are entitled to judgment as a matter of law.
III. Cook’s Motion for Summary Judgment
With respect to Cook, the plaintiff claims legal malpractice in connection with his work in obtaining her appointment as guardian of her children, and obtaining Tony’s appointment as administrator. The particular deficiency she identifies is his failure to discover the ownership interests she now claims, alert her to them, and take steps to protect them. She also seeks to hold Cook vicariously liable for the alleged conduct of Portnoy.
In his motion for summary judgment on all these claims, Cook adopts the arguments presented by the Ilacqua defendants, and also argues that the undisputed facts establish the absence of any negligence on his part and of any basis for vicarious liability. The plaintiff responds by seeking to postpone consideration of the motion pending further discovery, pursuant to Mass.RCiv.P. 56(f), and by arguing that genuine issues of material fact exist as to the scope of Cook’s duties and conduct, and as to the nature of his relationship with Portnoy.
In the Court’s view, the discussion and rulings set forth supra with respect to the claims against the Ilacqua defendants and Portnoy dictate the result as to Cook. All of the plaintiff s claims against Cook, like her claims against the other defendants, depend on her contention that she, Steven, and Victoria Rose had beneficial ownership of the corporations. For the reasons already discussed, the undisputed facts establish that they did not, and no basis exists to believe that further discovery will elicit evidence bearing on that issue. It follows that Cook is entitled to judgment as a matter of law.
IV. Plaintiffs Motion to Amend
On December 19, 2007, some five weeks after receiving service of defendants’ motions for summary judgment, the plaintiff served defendants with a motion to further amend her complaint. The crux of the proposed amendment is additional claims based on the allegation that Steven owned twenty-five percent of T.A.S. from its establishment in 1986. The sole basis for that allegation is the document described supra at p. 15. The parties agree that the plaintiff received that document in discovery on June 15, 2007, some eight months before the discovery deadline, five months before receiving service of the summary judgment motions, and two months before a status conference at which the Court set a schedule for summary judgment motions, and at which the plaintiff gave no hint of any proposed amendment. Between receipt of the document in June and service of the motion to amend, the plaintiff conducted depositions of Tony, Portnoy, and others, but asked no questions about the document. During that same time the defendants deposed the plaintiff, but also made no inquiry about any *95 potential claim relating to T.A.S., having no hint that any such claim might be asserted.
Mass.R.Civ.P. 15(a) provides that a court should grant leave to amend pleadings freely, when justice so requires. See Sharon v. Newton, 437 Mass. 99, 102 (2002). The decision whether to grant a motion to amend is within the discretion of the court. See Mathis v. Massachusetts Elec. Co., 409 Mass. 256, 264 (1991). A court may properly deny a motion to amend where good reason exists to do so, including undue delay, bad faith or dilatory motive on the part of the movant, repeated failure to cure deficiencies by amendments previously allowed, undue prejudice to the opposing party, or where amendment would be futile. See id., see also Castellucci v. United States Fidelity & Guaranty Co., 372 Mass. 288, 289-90 (1977); DiVenuti v. Reardon, 37 Mass.App.Ct. 73, 77 (1994). Where “the motion to amend is filed after the opposing party has timely moved for summary judgment, a plaintiff is required to show substantial and convincing evidence to justify a belated attempt to amend a complaint.” Massachusetts Eye & Ear Infirmary v. QLT Phototherapeutics, Inc., 412 F.3d 215, 231 (1st Cir. 2005).
Here, on the record presented, the conclusion is inescapable that the proposed amendment is nothing more than a belated effort to avoid summary judgment. The plaintiff argues that she could not proceed promptly upon receiving the document because she needed to complete depositions, but the record of those depositions does not support the contention; she has identified nothing elicited in them that supports the proposed new claims. The proposed amendment would open broad new areas of discovery, imposing substantial costs on defendants, and inevitably delaying resolution of the case. In the exercise of discretion, the Court will deny the motion.
CONCLUSION AND ORDER
For the reasons stated, the Motions for Summary Judgment of Defendants Anthony Ilacqua, Sr., Anthony Ilacqua, Jr., Malcolm Portnoy, Esq., S.D.I. Taxi, Inc., V.R.I. Taxi, Inc., Shadow Taxi, Inc., Seventh Street Taxi, Inc., and Legal Taxi, Inc., and of Defendants Michael K. Cook and Michael K. Cook, P.C. are ALLOWED. The plaintiffs Cross Motions for Continuance of each such motion for summary judgment are DENIED. Counts I through XVIII of the amended complaint are ordered DISMISSED. On Count XIX, judgment shall enter declaring that the plaintiff has no beneficial ownership interest in the stock of any of the five defendant corporations. Counsel for the Ilacqua defendants are directed to submit a proposed form of declaratory judgment within thirty days. Antonella Ilacqua’s Motion for Leave to File Second Amended Verified Complaint is DENIED.

 Marion is not the mother of Tony’s sons; Tony was widowed when he married Marion.

 Tony offers evidence that he paid all consideration for all medallions, in some instances financing them with bank loans, which he paid either directly or through corporations under his sole ownership. The plaintiff points out that in one instance, in 1999, Steven took a loan from Fleet Bank for the purchase of a medallion. Tony responds that all payments on the loan came from T.A.S. Taxi Management, Inc., of which he claims he was sole owner. T.A.S. will be discussed further, infra. The plaintiff does not contend that she herself paid any part of the consideration for any medallions, that her daughter Victoria did so, that anyone did so on behalf of either of them, or that Steven ever did so other than by means of the Fleet Bank loan.

 According to Tony and Portnoy, similar arrangements are common in the taxi industry.

 Family members involved included, in addition to Anthony, Steven, and their wives, Marion, her parents, and Tony’s mother and sister.

 Later agreements replaced the word “acquire” here with “distribute."

 Joanne and Anthony are in the process of being divorced. Joanne and Antonella are estranged.

 The record does not include testimony or affidavits from the various other family members who executed agreements. One of them, Tony’s mother, Grace Ilaqua, is now deceased.

 V.R.I. corresponds to the initials of Steven and Antonella’s daughter, Victoria Rose Ilacqua. S.D.I. corresponds to Steven’s own initials.

 That was the plaintiffs name at the time. She and Steven were dating but not married.

 No person by that name exists. Victoria Rose Ilacqua, daughter of Steven and Antonella, was less than a year old at the time. The record does not indicate whether the social security number that appears on the tax returns for Seventh St. Taxi, Inc., is that of Victoria Rose Ilacqua.

 Notably absent from both sides’ presentations is any expert testimony regarding authenticity of the signatures on the agreements, although the plaintiff has been provided access to the originals specifically for the purpose of expert examination. The plaintiff suggests that she has been unable to obtain expert analysis of the signatures purporting to be Steven’s because she lacks access to documents known to contain Steven’s signature. She does not explain why she would not be able to obtain access to bank account records, personal income tax returns, the couple’s application for their marriage license, or other such documents, nor does she identify any obstacle to expert analysis of her own purported signature.

 Anthony and Joanne were married at the time; An-tonella and Steven were dating.

 Among the documents appearing in the record are three cover letters from Portnoy to the Hackney Division, all dated November 24, 1986, enclosing forms requesting approval of transfers of medallions from Tudor Cab, Inc., respectively, to Shadow Taxi, Inc., Bright Taxi, Inc. (owned by Virginia Murphy, Marion Ilacqua’s mother), and Arrow Taxi, Inc. (owned by Anthony). Each letter describes the circumstances of the transfer, as follows: “Tudor Taxi, Inc. owns its medallions free and clear of all encumbrances and Mr. Ilacqua who was a widower has recently remarried. It is Mr. Ilacqua’s desire to responsibly plan for his retirement from the Cab business by transferring at this time, medallions controlled by him to his sons who are in business with him as well as to his wife. These transfers are being made for other than a financial consideration and as part of an over (sic) estate plan for Mr. Ilacqua.” The letter relating to Bright Taxi, Inc., adds “and mother-in-law” among the transferees.

 H1s deposition testimony ascribes that belief to documents filed with the Division, conversations with Steven in the late 1980s, and perhaps also conversations with Anthony in which “[i]t probably came up.” Devine testified also that at some unspecified time between 1992 and 1994 Tony told him “that he was going to get out of the business” and that he was “grooming Anthony and Steven to take over the business.” Although Tony never told Devine that he was giving medallions to his sons, Devine believed that Tony was doing so, based on the fact that medallions were transferred to them as reflected in filings, and that “I don’t think Steven or Anthony Junior could afford them.”

 T.A.S., according to Tony, stands for Tony, Anthony, and Steven.

 Portnoy testified that that was its primary purpose. Funds for the medallion purchases came from Tony, who obtained them by borrowing against his home. He would funnel the money through T.A.S. so that it would be treated as loans from him to that company, and to minimize his personal exposure to potential liability for claims against the corporations.

 The Court notes that the minutes bear no signature or certification.

 Anthony and Joanne executed a similar prenuptial agreement, dated June 8, 1988, also prepared by Portnoy. Anthony’s schedule of assets listed “Shares of Stock in Arrow Taxi, Inc.,” with “net equity” of $190,000. Joanne’s schedule listed no assets, although she was the record owner of Waterfront Taxi, Inc.

 The precise nature of the relationship between Portnoy and Cook is among the subjects of dispute in connection with Cook’s motion for summary judgment.

 The evidence identifies those assets as a small bank account, a certificate of deposit, and a $100,000 life insurance policy. Cook, according to his deposition testimony, had no awareness of any stock in Steven’s name at that time.

 Estate planning was a project that, according to Portnoy’s deposition testimony, he at various times urged Tony to undertake. Tony, Portnoy testified, “just kept ignoring the problem.” The record includes Portnoy’s notes of a meeting on the subject with Tony and accountant Jason Orlov on December 19, 1995. Portnoy wrote: “Jason informs us that although the original medallions which were in Tudor and were transferred to other coip ... he still carried them in the name of Tudor Cab Inc. as he did not want to pick up a sale to the new corporations because of . . . tax exposure on the gain .. . This is further complicated as the new corporations we drafted have other persons listed as the owner and sole stockholder (see list attached). I am also concerned relative to estate tax planning for Tony to pass the stock that he actually owns to Stephen and Anthony Jr. I also indicate that some of the stock is listed in Tony’s mother’s name (Grace) and his sister (Dorothy Raimondi). Also in Marion Ilacqua’s mother and father’s name Virginia and William Murphy. Jason suggests that inheritance tax wise this is an advantage ... I am still concerned as Tony is the true owner and I do not want to have to deal with the heirs of anyone who dies before Tony who might think the deceased actually owned the stock. We have to set up a plan to transfer assets to the boys. Each one has one corporation and their wives have one corporation ...” The list attached set out the names of eleven corporations. Next to each was the name of a family member, and a number of medallions. Steven’s name appeared next to Shadow, and Antonella’s next to Legal. Tony’s lawyers’ effort at estate planning apparently has continued at least to the recent past. The plaintiff has submitted a copy of a letter to Tony, dated September 29, 2005, from a lawyer in Cook’s office, providing “an overview of the estate planning issues and considerations relating to the creation of your estate plan.” The letter lists Tony’s assets, “based on the information provided to me,” as including taxi medallions held by five corporations, not including the corporations involved in this case, along with a seventy-five percent interest in T.A.S. Taxi Management. The letter does not indicate the source of the lawyer’s information.

 Also in 2004, at about the same time, documents using similar language were prepared, executed, and filed transferring the stock in Sixth St. Taxi, Inc., from the name of Tony’s deceased mother to Anthony. From the time of her death some years earlier until 2004, the stock in that company had remained in her name, and various documents had been signed and filed in her name.

 During the first day of the deposition, Tony was asked who owned the stock of T.A.S., and responded first that he did not remember, and later that he owned all its stock. During the continuation of the deposition in December 2003, he testified that he owned 75 percent and Anthony owned 25 percent.

 Counsel proposes to depose defendants’ accountants, an administrative assistant for Portnoy and Cook, and a keeper of records for the Hackney Division, and to complete depositions that have begun of the director of the Hackney Division, the Ilacquas’ insurance agent, and Joanne Ilacqua. Counsel proposes also to “[a]cquire signed tax records from the defendant entities,” and to conduct “[r]esearch of other claims involving the taxi entities.”

 The one possible exception would be facts of which the plaintiff might be unaware that might support a theory of judicial estoppel, based on conduct in other litigation. This, apparently, is what counsel means by “ [research of other claims involving the taxi entities.” Absent from her motion and affidavit, however, is anything to suggest that any such litigation has occurred, other than the McKeon case, which has already been the subject of full discovery. Given that Tony, Anthony, and Portnoy have all been fully deposed, without identifying any other such litigation, the prospect that further research would turn up a basis for a theory of judicial estoppel appears to be pure speculation.

 As indicated supra, although the purpose of the agreements, and the transfers reflected in them, does not appear to have been related to insurance premiums, the evidence offered would support an inference that, at least for the year 1994, representations made to the insurer based on the nominal ownership reflected in the agreements resulted in lower premiums than would have applied if Tony had acknowledged his ownership. Those representations could be found to have been fraudulent. Here too, however, Steven, Victoria, and Antonella were not victims of the fraud. If they were affected by it all, they would have benefitted from it, to the extent that it conserved funds of the business.

 Two representations were made to Antonella by Steven: one in his schedule of assets appended to the prenuptial agreement, and the other in his oral statements to her that he owned taxi medallions. Neither can be attributed to Tony. Nor does anything suggest that she relied on either. To the contrary, she expressly waived any claim to his assets in the prenuptial agreement.

 The Court’s conclusion on this issue should not be taken as approval of Tony’s conduct in the McKeon case. His answers to deposition questions can hardly be viewed as telling the “whole truth,” as his oath required him to do. Whether that conduct might give rise to some remedy on behalf of the McKeon plaintiffs is beyond the scope of this case.